# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SEAN WILKERSON and ABBY WILKERSON, | ) ) ) | C.A. No.: S24A-12-001 RHR |
| Plaintiffs Below/Appellees, | ) ) | |
| v. | ) ) | |
| A.S.A.P. SERVICES, CORP. and WILLIAM GROSS, | ) ) ) | |
| Defendants Below/Appellants. | ) | |

Submitted: June 17, 2025
Decided: September 2, 2025

## MEMORANDUM OPINION

*Upon Appeal from the Court of Common Pleas*,
**AFFIRMED**.

Dean A. Campbell, Esq., LAW OFFICE OF DEAN A. CAMPBELL, PA, Milton, Delaware, *Attorney for Appellees Sean Wilkerson and Abby Wilkerson.*

Richard E. Berl, Esq., HUDSON, JONES, JAYWORK & FISHER, LLC, Lewes, Delaware, *Attorney for Appellants A.S.A.P. Services, Corp. and William Gross.*

**Robinson, J.**

A.S.A.P. Services and William Gross (collectively, "A.S.A.P.") appeal a decision of the Court of Common Pleas that found A.S.A.P. liable for breach of contract and negligence *per se*. The trial court found that A.S.A.P. produced a faulty septic inspection report and that the Wilkersons, relying on that report, constructed a pole building above their drain field in violation of the conditions of their septic permit. The court awarded the Wilkersons $32,320.00 with post-judgment interest, jointly and severally, against A.S.A.P. and Gross The trial court did not err as a matter of law and its reasoning was sufficiently supported by the record. Therefore, the decision and order of the Court of Common Pleas are **AFFIRMED**.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 4, 2020, the Wilkersons entered into an agreement of sale with Richard and Jessica Pizzaia for the purchase of a home in Laurel, Delaware (the "Agreement"). The Wilkersons planned to construct a large pole barn on the property for Mr. Wilkerson to use as a garage for auto repair and restoration. The property's capacity for such a building played a significant role in their decision to purchase the home.

In compliance with 7 *Del. Admin. Code* § 7101-5.4.6.3.1, paragraph 22(a) of the Agreement required the Pizzaias to provide a septic system inspection report from a Class H licensee "indicating that the [septic] system is in good working order

2

with no major defects by October 19, 2020."[1] Pam Price, the realtor for both the Pizzaias and the Wilkersons, agreed to obtain the inspection report on the Pizzaias' behalf. As is her usual practice, Price procured the inspection from A.S.A.P. Services and specifically requested William Gross to be the inspector. As mentioned above, a septic system inspection by a Class H licensee is a mandatory condition to the sale any property containing an on-site wastewater treatment disposal system ("OWTDS") under 7 *Del. Admin. Code* § 7101. As a result, septic system inspections are subject to many regulations. The following Class H inspection regulations are relevant to this case:

- 7 *Del. Admin Code* § 7101-5.4.6.3.1: "For all properties utilizing an OWTDS that are sold or otherwise transferred to other ownership, the persons must have the system pumped out and inspected by a Class F and Class H licensee, respectively, prior to the completion of sale."

- 7 *Del. Admin Code* § 7101-5.4.6.3.5: "Research historic records with DNREC (permits and/or site evaluations) through tax map numbers and previous owners. Submission of current zoning certificate required."

- 7 Del. Admin Code § 7101-5.4.6.3.6: "All reports are required to be submitted on forms provided by the Department and are not to be altered without the prior approval of the Department . . . ."

---

[1] R., Ex. 1, Sales Contract ("Agreement") at 7.

3

- _7 Del. Admin Code § 7101-5.4.6.3.7_: "Interview the homeowner and/or tenants when completing the inspection forms, if available."

- _7 Del. Admin Code § 7101-5.4.6.3.13.1_: "Perform visual inspection of the drain field area."

- _7 Del. Admin Code § 7101-5.4.6.3.13.2_: "Using system records and permits, if available, locate the drain field."

- _7 Del. Admin. Code § 7101-5.4.6.3.19.1_: "A site drawing to scale, straight edge must be used (no free-hand lines), must show a reference point such as numbered utility pole, telephone or electrical box, building(s), property corners or fixed survey markers, or GPS coordinates. A minimum of two (2) such reference points should be noted on the site sketch. Site sketches shall be based on a whole number scale not to exceed one (1) inch equals 100 feet. Acceptable scales are: 1 inch = 10, 20, 30, 40, 50, 60, or 100 feet."

To ensure compliance with § 5.4.6.3.5, A.S.A.P.'s employee Susan Mitchell would typically obtain historic records from Department of Natural Resources and Environmental Control's ("DNREC") online portal and supply them to Gross for his review prior to any inspection. In the Fall of 2020, however, DNREC was in the process of scanning existing permits and storing them electronically, and many of its employees were working remotely because of the pandemic. Because of this, Mitchell never obtained the records required for the inspection. She testified that an

4

employee at DNREC's Georgetown office informed her that they could not find the permits for the Pizzaias' property, and that Mitchell would have to call back later. Mitchell called back either three or four days before the inspection, and then once more on the day immediately before the inspection. Each time she called, she was told that the permits could not be found. Mitchell spoke to multiple employees at DNREC's Georgetown office but never called the Dover office. According to Tisha Boyd, an employee at DNREC's Dover office, the permits were available and could have been obtained had Mitchell called the Dover office. Despite A.S.A.P.'s failure to obtain the necessary records, Gross conducted the septic system inspection anyway. He provided a non-scale drawing of the septic system incorrectly showing that there was a single active drain field in the middle-left portion of the property.

After purchasing the property, the Wilkersons began constructing a pole building for Mr. Wilkerson to use as a garage. Relying on Gross's report, they placed the building at the back right portion of the lot so it would not be above the drain field. During construction, the builders dug up a small, one-inch PVC pipe. The builders contacted Mr. Wilkerson about the pipe and sent him a picture. Mr. Wilkerson recalled that the previous owners kept pigs and chickens on the property and that such pipes were commonly used to provide water to livestock. He also knew that Gross's report indicated that the only drain field was located at the left side of the property. Mr. Wilkerson therefore concluded that the pipe was a non-issue and

5

advised the workers to continue construction. When the project was nearly complete, Mr. Wilkerson noticed sewer effluent pooling on the floor of the pole building. He obtained the 2013 septic permit from DNREC—the permit Gross was required to review before the inspection—and noticed that it prohibited the placement of concrete/asphalt and ancillary buildings on the drain field. Mr. Wilkerson deduced that the building had been constructed on an active drain field. The Wilkersons later discovered that the property contained two additional abandoned drain fields. Apparently, Gross misidentified an abandoned drain field as the active drain field and overlooked the other two entirely.

Gross later admitted that he went into the inspection "blind" and that he "winged it."[2] He also admitted that he did not interview the Pizzaias, create a scale drawing of the property, know whether the system had previously been repaired, or know whether there were any abandoned drain fields. In his report, he indicated that the system had not previously been repaired, and he did not indicate whether there were any abandoned drain fields.

After discovering Gross's errors, the Wilkersons hired a geotechnical engineer to assess the structural integrity of the building. The engineer advised the Wilkersons to abandon the active drain field and construct a new one. The engineer's report noted that abandoning the active drain field would require several costly

---

[2] Tr. of Proceedings (May 29, 2024) at 110–11.

interventions, such replacing loose soils around the perimeter of the building with structural fill. According to the Wilkersons, the costs of construction and mitigation would total $32,320.00.

The Wilkersons brought this action against A.S.A.P and Gross seeking recovery of the $32,320.00 under theories of breach of contract, professional negligence, and negligence *per se*. The parties tried the case in the Court of Common Pleas on May 29, 2024, and submitted written closing arguments on July 8, 2024. The court issued its decision on November 27, 2024, finding A.S.A.P. and Gross jointly and severally liable for $32,320.00 for breach of contract and negligence *per se*. The court determined that there was insufficient evidence for the Wilkersons to prevail on their professional negligence claim. On December 11, 2024, A.S.A.P. and Gross filed a notice of appeal with this court. The parties have completed their briefing.

**THE PARTIES' CONTENTIONS**

**A.    A.S.A.P.'s Claims**

A.S.A.P. claims that the Court of Common Pleas erred by ignoring critical facts, misinterpreting certain legal issues, and misapplying the law. Specifically, A.S.A.P. contends that the court (1) improperly "expanded" the A.S.A.P.-Price contract by finding that the Wilkersons were third party beneficiaries; (2) overlooked A.S.A.P.'s inability to comply with DNREC regulations; (3) overlooked the

7

Wilkersons' contributions to their own damages; (4) misinterpreted and misapplied the negligence *per se* doctrine; and (5) improperly analyzed the Wilkersons' damages claims.

A.S.A.P. raises the following arguments to demonstrate that the trial court improperly "expanded" the A.S.A.P.-Price agreement: (1) the Agreement imposed a duty on the sellers to produce an inspection report showing that the septic system was in good working order and that "nothing in the contract required A.S.A.P. to do anything more;"[3] (2) the Wilkersons "assumed the risk that things might not be the way they appeared" when they failed to condition the Agreement on further verification of the type of septic system, historical records, and location of the drain field;[4] (3) the trial judge incorrectly stated that Gross failed to demonstrate that the system was working properly;[5] (4) the trial judge misinterpreted the Agreement as permitting the buyers to void the agreement within five days of reviewing the septic report;[6] (5) the Pizzaias' disclosures indicated that there were no abandoned drain

---

[3] Opening Br. at 11 (citation modified).

[4] *Id*. at 12.

[5] This argument will not be addressed in this decision because the trial court clearly explained its reasoning behind this conclusion, and it does not advance any of A.S.A.P.'s arguments. *Wilkerson v. A.S.A.P. Servs. Corp.*, 2024 WL 5117074 (Del. Ct. Com. Pleas Nov. 27, 2024) ("However, *as Gross failed to pinpoint the location of the active drain field*, his site evaluation and subsequent report did not even demonstrate the system worked properly.") (emphasis added).

[6] This too will not be included in the analysis below—it advances none of A.S.A.P.'s arguments and is not relevant to this appeal.

fields on the property; and (6) "the clear terms of the Pizzaia-Price[7] contract (premised on the Agreement) established an obligation for the Pizzaias to produce a report confirming that the septic system was in good working order, and nothing else."[8]

In support of its second claim, A.S.A.P. argues that its inability to obtain the prior permit gave rise to an impossibility/impracticability defense. A.S.A.P. lists the elements of the defense and points to various factors that made performance impossible or impracticable.

A.S.A.P. claims that the Wilkersons contributed to their damages in the following ways: (1) by failing to verify whether the pole building could be placed in the back right portion of the property; (2) failing to include language in the Agreement requiring verification of the location of the drain field; (3) failing to personally inspect the one-inch pipe that was discovered during construction of the pole building; (4) and failing to call an expert or A.S.A.P. to confirm that the pipe was not unearthed from a drain field.

A.S.A.P. argues that the trial court misinterpreted and misapplied the negligence *per se* doctrine because (1) the relevant DNREC regulations were not

---

[7] This is the only mention of a "Pizzaia-Price contract" in this case. It is unclear whether this is a typographical error or this agreement actually exists. Regardless, A.S.A.P. does not claim to be a party to the agreement, so it does not alter this court's analysis of A.S.A.P.'s appeal.

[8] Opening Br. at 13.

9

intended to safeguard "personal safety," as required by the doctrine; (2) the Wilkersons never showed causation; and (3) A.S.A.P.'s violation of the DNREC regulations was excusable.

Finally, A.S.A.P. contends that the trial court improperly analyzed the Wilkersons' damages by allowing them to recover costs that were speculative and unnecessary. A.S.A.P. specifically takes issue with the facts that (1) the Wilkersons had not yet completed construction of a new septic system and (2) there is no evidence proving that replacement or remediation is necessary.

## B.    The Wilkersons' Response

In response to A.S.A.P.'s argument that the trial court improperly expanded the A.S.A.P.-Price agreement, the Wilkersons argue that (1) the terms of the Agreement are not controlling because that agreement has not been breached; (2) Price hired A.S.A.P. on behalf of the Pizzaias for the benefit of the Wilkersons; (3) 7 *Del. Admin. Code* § 7101 controlled the terms of the agreement; and (4) the Wilkersons were third party beneficiaries because 7 *Del. Admin. Code* § 7101 and the Agreement required the inspection to be performed and provided to the Wilkersons.

Next, the Wilkersons argue that A.S.A.P. does not have an impossibility or impracticability defense because acquiring the documents was feasible.

The Wilkersons contend that they did not contribute to their own damages because all alleged contributions were the result of their reasonable reliance on Gross's report and that a finding of reasonableness is an issue of fact which is owed greater deference.

The Wilkersons argue that negligence *per se* applies because (1) the DNREC regulations are safety regulations and (2) they sufficiently proved causation at trial.

Finally, the Wilkersons argue that the trial court's analysis of damages was proper because the Wilkersons are now in violation of the conditions of their septic permit and must construct a new drain field to be in compliance.

## STANDARD OF REVIEW

As an "intermediate appellate court," the Superior Court hears appeals from the Court of Common Pleas and functions much like the Delaware Supreme Court.[9] Appeals from the Court of Common Pleas must be reviewed on the record and shall not be tried *de novo*.[10] This court reviews factual findings to determine whether they "sufficiently are supported by the record and are the product of an orderly and logical deductive process."[11] This court will not make independent factual findings or determinations of credibility.[12] Questions of law, however, are reviewed *de novo*.[13]

---

[9] *Miller v. Silverside*, 2016 WL 4502012, at *5 (Del. Super. Ct. Aug. 26, 2016) (citations omitted).
[10] *Meyers v. Chatham Cove Ass'n of Unit Owners*, 2025 WL 1744378, at *2 (Del. Super. Ct. June 24, 2025).
[11] *Miller*, 2016 WL 4502012, at *5.
[12] *Meyers*, 2025 WL 1744378, at *2.
[13] *Miller*, 2016 WL 4502012, at *5.

11

**DISCUSSION**

Each of A.S.A.P.'s arguments fails to demonstrate that the trial court's ruling was unsupported by the record or that it committed an error of law. As discussed below, the trial court properly found that (1) the Wilkersons were third party beneficiaries to the A.S.A.P.-Price agreement; (2) A.S.A.P.'s difficulties in obtaining the required records did not excuse its breach; (3) the Wilkersons did not fail to mitigate their damages; (4) A.S.A.P. was liable for negligence *per se*; and (5) the Wilkersons' requested damages were reasonable.

**A.    The Trial Court Did Not Improperly Expand the A.S.A.P.-Price Agreement.**

The trial court properly determined that the Wilkersons were third party beneficiaries to the A.S.A.P.-Price agreement. Paragraph 22(a) of the Agreement and 7 *Del. Admin. Code* S 7101 required the Pizzaias to obtain a septic inspection report for the Wilkersons. The record shows that Price set out to satisfy this obligation for them. The court's conclusion that the Wilkersons were intended beneficiaries of that agreement was therefore well-reasoned and supported by the record. A.S.A.P.'s arguments to the contrary almost exclusively focus on the terms of the Agreement, which is not controlling here. The Agreement is only relevant because it required the inspection to *happen*—it was never intended to compile each of A.S.A.P.'s duties. Otherwise, A.S.A.P.'s arguments are facially meritless.

12

The following must be true for a third party to qualify as an intended beneficiary:

> (i) the contracting parties must have intended that the third-party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract.[14]

The trial court reasoned that the Wilkersons were third party beneficiaries to the A.S.A.P.-Price agreement largely because both the Agreement and DNREC regulations required Gross's inspection as a condition to the sale of property. This court agrees. Price specifically sought Gross's services to satisfy the Pizzaias' obligation under paragraph 22(a) of the Agreement. Paragraph 22(a) makes it the "sole cost and responsibility [of the Seller] to provide the Buyer with the report . . . ." Considering that language, this court will not disturb the trial court's factual determination that A.S.A.P. and Price (who acted as broker for the sellers and the buyers) intended to benefit the Wilkersons when they contracted for the production of a septic system report. Likewise, no reasonable interpretation of the evidence presented could support a finding that the remaining two elements were not satisfied. The fact that the Agreement and DNREC regulations required an inspection report to be provided to the Wilkersons clearly supports the trial court's conclusions that the inspection report was intended to satisfy a pre-existing obligation to the

---

[14] *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 271 (Del. 2022).

13

Wilkersons and that the parties' intent to provide the report was a "material part of [their] purpose in entering into the contract." For those reasons, this court finds that the trial court's decision regarding the Wilkersons' status as third-party beneficiaries was well-reasoned and proper. This court is not persuaded otherwise by any of the arguments advanced in A.S.A.P.'s briefing.

A.S.A.P. contends that (1) the Agreement never explicitly imposed a duty upon them; (2) the Wilkersons were at fault for failing to condition the Agreement on further verification of the location of the drain field; (3) the Agreement only required A.S.A.P. to produce an inspection report showing that the system was in good working order; (4) the Pizzaias' disclosures indicated that there was no drain field on the right side of the property; and (5) "the clear terms of the Pizzaia-Price contract (premised on the Agreement) established an obligation for the Pizzaias to produce a report confirming that the septic system was in good working order, and nothing else."[15] As to the first argument, A.S.A.P. is not freed from liability for any duty not contained in the Agreement because it was not a party to that agreement and has not been accused of breaching it. The Agreement is simply evidence of A.S.A.P. and Price's intent to confer a benefit to the Wilkersons. A.S.A.P.'s remaining arguments are wholly without merit; each claim either attempts to impose a fictitious duty upon another party or is otherwise overcome by the fact that

---

[15] Opening Br. at 13.

A.S.A.P.'s duties were clearly established by the A.S.A.P.-Price agreement—the only agreement to which it was a party—and mandated by the DNREC regulations. The trial court properly reasoned that A.S.A.P. could not escape its duties under its agreement with Price and that its breach gave rise to the Wilkersons' claim.

**B.      The Trial Court Did Not Erroneously Overlook A.S.A.P.'s Inability to Comply with DNREC Regulations.**

A.S.A.P. argues that it was unable to comply with DNREC regulations and that the trial court ignored this fact by rejecting A.S.A.P.'s impossibility/impracticability defense. This argument also lacks merit. By raising this defense, A.S.A.P. concedes that an impracticability existed that justified nonperformance and that it performed nonetheless.[16] Further, because A.S.A.P. was found liable for breaching the agreement by deficient performance (as opposed to nonperformance) this defense is unavailable, and no further analysis is necessary. A.S.A.P. also claims that there was "nothing more [that Mitchell] could have done to obtain the records and the [t]rial [c]ourt erred in finding to the contrary."[17] It is of no significance that A.S.A.P. was unable to obtain the required records because, if the records were truly unavailable, it never should have performed in the first place.

A.S.A.P. also claims that the DNREC regulations accounted for permits being unavailable by using the language, "[u]sing system records and permits, if available,

---

[16] *Id*. at 14.
[17] *Id*. at 16.

locate the drain field."[18] The trial court heard testimony from DNREC employee Tisha Boyd, however, where she opined that this language merely anticipated that certain properties do not have permits at all.[19] The trial court's rejection of A.S.A.P.'s defense is therefore supported by the record.

**C.    The Trial Court Did Not Erroneously Overlook the Wilkersons' Contributions to Their Damages.**

A.S.A.P. alleges that the Wilkersons took on a duty to mitigate their damages upon receipt of Gross's report, and that they fell short of that duty when they constructed the pole building in reliance on the report.[20] Each of A.S.A.P.'s supporting arguments rests on the notion that the Wilkersons should be liable for failing to double-check Gross's work—i.e., they should have presumed that Gross's report could have been inaccurate.[21] Failure to mitigate operates as an affirmative defense where a defendant demonstrates that a plaintiff failed to "avoid unreasonable costs that they could have avoided through reasonable efforts." As to A.S.A.P.'s argument that the Wilkersons should have halted construction after discovering the one-inch pipe, the court held that this was "inaccurate as mere months prior [the

---

[18] Tr. of Proceedings (May 29, 2024) at 30.
[19] *Id.*
[20] A.S.A.P. does not explain how the Wilkersons' failure to mitigate would affect the outcome of the case. Presumably, A.S.A.P. seeks either partial or entire recovery by way of set-off damages.
[21] Again, A.S.A.P. argues that the Wilkersons failed to (1) verify whether the building could in fact be placed in the back right portion of the property; (2) include a provision in the Agreement requiring verification of the drain field; (3) inspect the one-inch pipe discovered by construction workers to verify that it had not been borne from a drain field; and (4) call an additional expert to once again verify that the pipe was not from a drain field.

16

Wilkersons] received an inspection by a Class H license inspector [showing] that there was nothing in that area."[22] This reasoning logically extends to all alleged instances of the Wilkersons' failure to mitigate, as their discovery of the one-inch pipe falls last in time and is the moment where Gross's breach of contract was most apparent, but still reasonably undiscoverable. The trial court heard and considered the Wilkersons' testimony about why they did not second-guess the report and its determination that the Wilkersons took reasonable efforts to avoid unreasonable costs is, therefore, reasonable and supported by the record.[23]  For that reason, A.S.A.P. has failed to show that the court erred by ignoring the Wilkersons' contributions to their damages.

**D.      The Trial Court Did Not Improperly Apply the Doctrine of Negligence *Per Se*.**

A.S.A.P. argues that the court misapplied the negligence *per se* doctrine because (1) the doctrine is reserved for statutes related to "personal safety"; (2) the Wilkersons did not establish causation; and (3) Gross's violation was excusable. A.S.A.P.'s arguments cannot be addressed without first clarifying the limitations of the doctrine as it applies to administrative regulations.

In 1972, the Delaware Supreme Court decided *Sammons v. Ridgeway*, holding that "it has been long settled in this State that the violation of a statute or ordinance

---

[22] *Wilkerson*, 2024 WL 5117074, at *12.
[23] *See, e.g.*, Tr. of Proceedings (May 29, 2024) at 56–57.

enacted for the safety of others is negligence in law or negligence *per se*."[24] It further held that there is "no valid distinction, in the applicability of the negligence *per se* doctrine, between a rule . . . prescribed by statute, on the one hand, and one prescribed by regulation of a State agency expressly authorized by statute, on the other."[25] The Supreme Court expounded on this rule many years later, explaining that "the significance of the *Sammons* ruling extending the negligence *per se* doctrine to regulations of an administrative agency is its requirement that actionable administrative regulations must be promulgated pursuant to legislative directive and enacted for a valid purpose."[26]

The regulations violated by Gross were legislatively promulgated and enacted by the Secretary of DNREC under statutory authority. The Foreword to Chapter 7101 states that it was "adopted by the Secretary of [DNREC] under and pursuant to the authority set forth in [Chapter 60 of Title 7 of the Delaware Code]." 7 *Del. C.* § 6032 provides that "[n]o person shall conduct percolation tests or soil evaluations or

---

[24] 293 A.2d 547, 549 (Del. 1972) (citation modified); *also see Fansler v. N. Am. Title Ins. Co.*, 2020 WL 5793750, at *2 (Del. Super. Ct. Sept. 29, 2020) ("'On a claim for negligence per se, a party must make a four-part showing.' First, the party 'must show that the statute in question was enacted for the safety of others.' Next, the party 'must demonstrate a causal connection between the statutory violation and the injury, and, that [the party] was a member of the class of persons the statute set out to protect.' Then, the party 'must show that the statute set forth a standard of conduct which was designed to avoid the harm [the party] suffered.' Finally, the party 'must show that [the other party] violated the statute by failing to comply with that standard of conduct.'") (citations omitted).

[25] *Id*. at 549–50 (citation modified).

[26] *Toll Bros., Inc. v. Considine*, 706 A.2d 493, 497 (Del. 1998).

design, inspect or install on-site wastewater treatment and disposal systems without first having obtained a license from the Secretary." Under § 6032, "[a]s a prerequisite of licensing, the Secretary may require the person to . . . sign a statement under penalty of perjury that he or she will abide by all statutes and regulations governing the design, inspection and installation of on-site wastewater treatment and disposal systems." Further, 7 *Del. C.* § 6010 directly authorizes the Secretary to "adopt, amend, modify or repeal rules or regulations, or plans, after public hearing, to effectuate the policy and purposes of [Chapter 60]." In short, 7 *Del. Admin. Code* § 7101 was enacted pursuant to the Secretary's authority under Chapter 60 of Title 7 of the Delaware Code to ensure compliance with licensing and system inspection requirements. The negligence *per se* doctrine therefore applies to violations of 7 *Del. Admin. Code* § 7101 insofar as the "legislatively promulgated" requirement is concerned.

This court disagrees with A.S.A.P.'s "personal safety" argument for two reasons. First, A.S.A.P. has not even attempted to draw a distinction between "safety" and "personal safety" for the purposes of determining whether negligence *per se* is available under a specific regulation. Second, assuming, *arguendo*, that a regulation must have been enacted to ensure safety on a more individual or physical level—if this is what A.S.A.P. means by "personal safety"— 7 *Del. Admin. Code* § 7101 still passes muster. The Foreword to § 7101 states that:

19

Statewide regulations governing the installation and operation of wastewater treatment and disposal systems have existed since 1968. Inappropriate installations and poor operation and maintenance practices have resulted in treatment and disposal system malfunctions. Inadequately renovated wastewater has contaminated the State's groundwater and is presenting a threat to the *public health, safety, and welfare*. Corrective measures require the replacement of water supply and wastewater systems, sometimes at a very high cost, which is sometimes borne by the general public. As such the Department's regulations governing the *site evaluation*, siting density, installation, operation and maintenance of on-site wastewater treatment and disposal systems have been identified as requiring revisions.

Through a process that included considerable staff research, consultant studies, the development of background "working papers", interaction with public/private sector on-site wastewater industry professionals, public meetings and presentations, public workshops, a public hearing and a hearing officer's report along with draft versions of this Regulation were prepared, reviewed and revised. This final version is the result of those various activities, and incorporates, as best as possible, all valid concerns into its provisions.[27]

These administrative rules regulate site evaluations and attempt to prevent poor system maintenance, among other things, specifically for the purpose of safeguarding public health, safety, and welfare. This language was cited in the trial court's opinion and by A.S.A.P. in its opening brief.[28] The statute clearly aims to ensure the health and safety of individual Delawareans. This court agrees with the trial court's determination that § 7101 was intended to ensure "safety" as anticipated by the negligence *per se* doctrine.

---

[27] 7 *Del. Admin. Code* 7101 (emphasis added).
[28] *Wilkerson*, 2024 WL 5117074, at *5; Opening Br. at 22.

A.S.A.P.'s argument that the Wilkersons never established causation for their negligence claim also fails. The trial court concluded that the Wilkersons' actions were not the proximate cause of their damages, and in turn, that they reasonably relied on Gross's inaccurate inspection report.[29] It must logically follow that the report therefore proximately caused the Wilkersons' damages.

Finally, the trial court properly determined that A.S.A.P.'s conduct was not excusable when it found that A.S.A.P. breached its contractual obligations by producing an inspection report in violation of the DNREC regulations. While A.S.A.P. contends that it is absolved by the technical difficulties it faced in obtaining the permits, its actionable conduct occurred *afterward* when it produced an inspection report without the required documentation. A.S.A.P. itself argued that the circumstances justified nonperformance.[30] It goes without being said that A.S.A.P. is not excused from producing a faulty inspection report after realizing that critical components of the inspection were unattainable.

**E.     The Trial Court Did Not Grant Speculative or Unreasonable Damages.**

---

[29] *Wilkerson*, 2024 WL 5117074, at \*12 ("Plaintiff asserts they were damaged by Defendants' negligence causing Plaintiffs to place their pole building directly over the active drain field. . . . [D]uring construction contractors hit a PVC piece of pipe, however it was not perforated, there was no water and no smell. Plaintiffs continued with the construction. Defendants assert this is the proximate cause and Plaintiffs should have stopped construction and gotten a new inspection. The Court finds this inaccurate as mere months prior Plaintiffs received an inspection by a Class H license inspector that there was nothing in that area.").

[30] Opening Br. at 13.

A.S.A.P. argues that the Wilkersons' damage estimates were "nothing more than speculation and conjecture" and that the trial court erred by granting their requests.[31] A.S.A.P. claims that there is "no evidence or other testimony to confirm that an entirely new system, from design to construction, was necessary," and takes issue with the fact that the Wilkersons never received a violation and never asked DNREC if they could leave the system in its current state. The trial court did not err. It appropriately reasoned that:

> Plaintiffs knew they could not construct over the drain field and took great care to build the pole building as far away to the other side of the property. In addition, the DNREC regulations specifically require prior permits, interviews with the owner, drawing to scale of the entire septic system, and probing of the drain field for purposes of location and maintenance. If the pole building remains on top of the active drain field and there is a problem, Plaintiffs would be required to dig up the floor of the pole building to fix it.[32]

This reasoning is well-founded and clearly supported by the record, which includes but is not limited to: the Wilkersons' testimony about their construction plans; the relevant DNREC regulations; the geotechnical engineer's report (recommending abandonment of the system below the building);[33] and estimates from the construction company. Further, as noted in the Wilkersons' briefing, the Wilkersons are currently in violation of the conditions of their septic permit—also

---

[31] Reply Br. at 17.
[32] *Wilkerson*, 2024 WL 5117074, at *13.
[33] R., Ex. 5, J.D. Hynes Evaluation and CV at 3.

contained in the record—due to their reliance on Gross's report. The record reflects that the Wilkersons' means of remediation and cost estimates were reasonable. A.S.A.P. has therefore failed to demonstrate that the trial court erred by granting the Wilkersons' requested damages.

## CONCLUSION

A.S.A.P. has not shown that any of the trial court's conclusions were unsupported by the record or unreasonable, nor has it shown that the court committed an error of law. The trial court properly found A.S.A.P. liable for breach of contract and negligence *per se* and its damage award was reasonable. For the foregoing reasons, the decision of the Court of Common Pleas is **AFFIRMED** and its Order dated November, 27, 2024 remains in effect.

**IT IS SO ORDERED.**